Case 3-18-0716, The Village of Onarga v. Atlas Excavation, Inc. Mr. Gysin, you may proceed. I'm Bill Gysin. I represent Atlas and Hanover in this case. I'm accompanied today by my co-counsel, Roya Samargandhi. Distinguished panel, as you know, the issue before you here today is on a certified question and that question is, for an owner's defective construction claim under what I'm going to be calling Section 214A, does the four-year statute of limitations run from the time of when the owner or its privity knew or reasonably should have known of the act or omission giving rise to that claim or does it run from the time of the final completion of the construction project? Just as you well know, the statutes must be construed according to their plain, ordinary, and popularly understood language. And when you look at the plain language of 214A, it tells you that this particular statute of limitations, namely an owner's defective construction claim, is not triggered by the final completion of the construction project. The legislature did not incorporate final completion into an accrual date for this particular statute of limitations. Yet, ONARGA wants you to rewrite the statute and add final completion as a  ONARGA's interpretation of this particular statute of limitations is at the conclusion of its brief and I'll read it to you. ONARGA's interpretation of the statute is that the four-year statute of limitations begins to run at the later of the time when the owner or its privity knew or should have reasonably known of such act or omission giving rise to its claim, but not prior to the time of final completion of the construction project. Such language regarding the later of two time frames is nowhere to be found in section 214A. Nothing in the statute indicates that final completion is a trigger for the statute of you to adopt, namely that final completion is a potential trigger for a defective construction claim. You should not adopt such torched interpretation of a very clear statute. In fact, the Sherman case says that you as a court should not read into exceptions or make conditions to the conflict with the clear and expressed language that was intended by the General Assembly. So you should interpret the statute as clearly written and as intended by the General Assembly of this state, namely that the four-year statute of limitations for a defective construction claim is triggered by when the owner or its privity knew or reasonably should have known of the act or omission giving rise to that claim. Now, ONARGA wants you all to adopt this single endeavor exception for a defective construction claim, but no Illinois case has applied the single endeavor exception to a claim for defective construction since 214A was adopted in 1992. ONARGA has not and cannot cite you to a single case in Illinois which has adopted this single endeavor exception for a defective construction claim. In its brief, it's cited, I think it's called the M&S Industries case and the LaSalle Bank case is supposed to support for its position, but when you read those two cases, those two cases deal with a very fact-specific interpretation of when the discovery rule is triggered as the statute is clearly written. Those two cases say you won't find the words single endeavor anywhere in that case. You won't find the words final completion anywhere in those two cases, and those two cases don't cite the Santucci case which forms the basis for their position. So the two cases which they proclaim support their position actually do nothing but support their position, yet they support our position, namely that the discovery rule is something that should trigger a claim for defective construction. The village of ONARGA wants you to extend this single endeavor exception to a claim for defective construction, and so it wants this court to go out on a limb just like the trial court did when it denied Atlas' and Hanover's motion to dismiss. Every single, single endeavor case which is cited by ONARGA to support its position relates to a claim for nonpayment, not to a claim for defective construction. One case that it relies upon is the Santucci case was decided prior to the adoption and enactment of Section 214A. It tries to rely upon the Berg case, but that's a case on an oral contract. It has nothing to do with Section 214A, and again, it's a nonpayment case. It references two federal cases which are both unpublished, the McHugh cases, but yet those two cases are cases for nonpayment of contract sums. It also relies upon a case well over 100 years ago, the O'Brien case from 1892, which was issued 100 years before the adoption of 214A, and again, O'Brien is a nonpayment case. So you might ask, you know, what difference does it make whether it's a nonpayment case or a defective construction case? Well, if you're asking that question, I'll answer it for you. For a nonpayment case, at project completion, the contractor is going to know whether it's going to get paid for the work that it did to complete that project. In other words, it's going to know at the end of the project whether it's going to get paid for that single endeavor of completing all of the work within the scope of that particular contract. Whereas for a construction defect case, that claim may arise during the actual construction project or it may arise years, sometimes many years after the construction project. And for that very reason, the legislature adopted this discovery rule of it's four years from when, in this case, the owner, what we're talking about today, knew or reasonably should have known of the act of remission. For a construction defect claim, it is not a one-time failure to pay as a nonpayment case would be. In fact, in our briefs, we cite the Borach v. Turner case, and it recognized this distinction between a nonpayment case and a construction defect case. The Borach case, which was decided in 1996, dealt with a claim for negligent supervision of a construction project. And that is a claim which is within the scope of 214A. And what the Borach court held is that 214A expressly codifies the accrual date for a cause of action which falls within the scope of that statute. And it held that this Santucci case was a claim for unpaid contract balances, not a claim for improper project supervision. And it went on to say that for an improper supervision claim, the act of remission is not a one-time failure to pay the additional costs associated with job completion. Therefore, Borach held that the single endeavor concept does not apply to claims within the scope of 214A. Now, Justices, if you were to adopt Onarga's position, owners throughout Illinois could manipulate the final completion date by simply not signing the final completion certificate on the project, just as Onarga did in this case. So if you were to adopt their position and allow owners to manipulate the final completion date, a contractor's liability would run in perpetuity because, just as Onarga was saying, the trigger never started because I never signed off on the completion certificate. The Blinderman construction case held that the purpose of 214A is to prevent liability from running into perpetuity. Yet that is exactly what Onarga is trying to do with its rewritten statute. Cases interpreting 214A have held that the statute of limitation begins to run when the plaintiffs knew or should have known that the injury was wrongfully caused. And what they've decided what wrongfully caused means is that's the time when a reasonable person suspects that a legal duty has been breached. It has absolutely nothing to do with final completion. It's when a reasonable person suspects that the legal duty has been breached. And what the various courts have held is that at that point, the person must inquire further as to the existence of the cause of action. And at that time, the statute of limitation begins to run. It does not require actual knowledge of the negligent act or conduct. It does not require actual knowledge of the existence of a cause of action. It does not require actual knowledge of the full extent of the injury. Yet that's the position that Onarga wants you to adopt. If Onarga wants this panel to adopt this single endeavor concept into claims that fall within the scope of 214A, then you must ask them why it non-suited the other parties that were involved in this case, namely the engineers and the manufacturer. Because Onarga's doing so is nonsensical and completely inconsistent with the position that it's taking with respect to Atlas and Hanover. In their motions to dismiss, Sodeman and E1, the manufacturer, argued the same set of facts that Atlas and Hanover did, namely that Onarga was aware of the problems on this project in the 2010-2012 timeframe. And they argued either the exact same statute or a very similar statute to the ones that Atlas and Hanover are arguing. With respect to Sodeman and E1, Onarga did not take the position that the statute of limitations is triggered by final completion, which never occurred in their mind. What it did is it dismissed them. It non-suited them as parties. So the very fact that Onarga non-suited Sodeman and E1 from this action shows the complete fallacy of the position that they're trying to get you to adopt. So 214A is clear. And you must give Section 214A its plain and ordinary meaning. Onarga is trying to get you to rewrite the statute by including this final completion trigger into the statute. Yet Onarga cannot cite you to a single Illinois case which has adopted or applied this single endeavor concept for a defective construction claim. Two minutes, please. As you point out, it's been applied to some situations. It's been applied to non-payment type cases. It's never been applied to, Justice Carter, to a case for defective construction or any other claims that falls within the scope of 214A. But the General Assembly never incorporated this single endeavor concept into claims that fall within the scope of 214A, so the Court should not rewrite the statute as Onarga wants it to. The Borach v. Turner case got it right. 214A expressly codifies the accrual date for the cause of action which fall within the scope of those claims. That was a bankruptcy case. That was a bankruptcy case, it was. But it was a case that dealt with a negligent supervision of a construction project which is within the scope of 214A. But I acknowledge, Justice, that it was a bankruptcy case. But I urge you to follow the reasoning and the guidance of the Borach case. And I urge you to determine on this certified question that for an owner's claim for defective construction under 214A, the four-year statute of limitation runs from the time of when the owner or its privity knew or reasonably should have known of the act or commission giving rise to the particular claim. Thank you. Thank you. Any other questions? Thank you. Mr. Wolfe, you may proceed. Thank you. May it please the Court, Counsel. My name is Steve Wolfe and I represent the village of Onarga. The single-endeavor doctrine logically applies to the facts of this case. And I'm obviously going to discuss that in some detail. The defendants concede that the single-endeavor doctrine does apply to some construction situations, namely those of nonpayment of construction invoices or bills. And if you look at the statute, if you carefully read 214A, it is written broad enough to encompass payment of construction debts. If we look at the language of the statute, and I don't want to sit here and read something to you, but it expressly states that it's based upon actions upon tort, contract or otherwise for any act or omission regarding construction or improvement to real property. That clearly is broad enough to encompass a payment dispute. Design, planning, supervision, observation, or management of construction or construction of an improvement to real property. It's pretty specific. I skipped the inner part. The point I wanted to focus on is construction or improvement to real estate. So contract or otherwise for an act or omission to construction, regarding construction or improvement to real estate. That is broad enough to encompass a payment dispute regarding construction. It's a contract or otherwise regarding construction of real estate, regarding real estate. So clearly it's written broad enough to encompass a payment dispute between two parties regarding a construction project. So counsel has conceded that these payment disputes fall within the single endeavor doctrine and apply the one project as a whole rule that we're talking about today. So that fits within the language of the statute. There's a number of cases. If you go back over 100 years to the O'Brien case in 1892, which is the first case that we know that talks about this concept of the statute of limitations running upon the completion of the whole and not the parts that make up the whole, because a construction contract, especially a major contract, obviously has a lot of different parts. I mean, on a big project, you can have plumbing and electric and drywall and masonry. Or in this particular case, you've got the excavation of the pits. You've got the installation of the grinders. You've got the laying of the pipe. You've got different aspects of this job. So there are lots of different parts. When you don't get your check, when you don't get paid, is that when the newer should have reasonably known of the act or omission that gives rise to your payment? The answer is yes. And if I can clarify what counsel argued. Well, counsel argued that you know at the end of the project whether you're getting paid or not. But that's not true. Payments in construction projects are just like the pieces of which they're made. You don't wait until the very end to get paid. You get paid at various stages throughout the project. And projects can go on for years. And the contractors that are doing those jobs don't have to wait until the end to get paid. They know after the first month, after the sixth month, after the ninth month, after the tenth month. They have bills due and they're getting paid. There are other provisions, other statutory provisions, or your mechanics liens and all of those that cover that area. This is for when the newer should know that you're not going to get paid at all. So somebody is doing work and they submit a pay warrant to the bank and something in there to say that they're not going to keep working there. The point I want to make, Justice, is the statute is written broad enough to encompass paid disputes. I acknowledge there are mechanics liens, there are other laws and ways to ensure payment. But it's not that you just wait until the end of the job. These disputes can come up even if it's a mechanics lien. If there are other issues, contract disputes about what work was done, what work shouldn't be done, somebody gets kicked off the job, these can all be payment issues that clearly define or fall under the single payment, single endeavor doctrine. And those have been applied, which we know in Santucci and Berg and O'Brien, repeatedly. And the point I'm trying to make is there's a good reason for that. We don't want, number one, to require multiple different statutes of limitations that have to accrue during a project. It's disruptive. We don't want one party having to sue another party during the middle of a project with which they're both still working. We want them to be able to work things out. The contract requires that. If I'm on a construction project and there's a problem with the installation of grinder pumps and I say, look, these weren't done right, I want the party with whom I'm going to have a contract with to work on it, to fix it, to resolve it. That happens every day in construction projects. I want them to work on it, to resolve it, to correct the problem. I don't want to have to go out and sue them. So I — and that's exactly what happened here. There were problems. We acknowledged all of the problems early on. We brought them to the attention of ATLAS and other contractors, and we asked to get these resolved. And there was negotiations and work trying to get them resolved. Another point that I wanted to point out, which I think is very significant, and counsel didn't address this, but one of the last deficiencies that was discovered in this project was that the grinder pumps were cracking because they hadn't been installed properly. And that was not discovered until June of 2014, three and a half years before suit was filed. So at least one of the deficiencies that was discovered in this case was less than four years from the time suit was filed. But if we ruled in the opponent's favor, that wouldn't preclude that claim, would it? Wouldn't preclude that one claim, of course. We don't want just that one claim, Your Honor. We want all of the claims. The statute's been amended since the cases that you cite were decided. Given the plain language, how is it that now, after an amendment to the statute, that we can look at the plain language and, you know, I don't think there's any ambiguity in it. The statute was passed in 1992, and it's true. O'Brien, Santucci, and Berg were all pre-'92, pre-passing the statute. But if you look at the cases, if you look at the case of this Court in 1994, two years after the statute, LaSalle Bank, it's a third district case. That case is particularly instructive for our purposes in this case. A complaint in that case was filed nine years after the project was completed. And the problems with the heating system were readily apparent when the project first began being constructed. So we knew there were problems. The project had been completed for nine years, but the bank didn't have sufficient information that the problems were wrongfully caused. And what the Court talked about was a two-pronged test to determine when the statute runs. One is they knew of an injury. They knew early on that the heating system wasn't working properly, but they didn't know that it was wrongfully caused. And when you look to these cases, and not just LaSalle National Bank, but also M&S Industrial and McHugh, while they don't specifically, M&S doesn't specifically use the phrase single endeavor, they discuss the same principle. And that is when you're working with somebody in a construction project, you expect them to cure or fix the problem. You're working with them. You see them every day. You identify the problem. You say, we need to get this fixed. They say, okay, we're going to fix this. You shouldn't be required to have the clock start running to sue them. Now, you don't know that you've been wrong until they refuse or fail to cure the problem, which leads me to another important fact in this case, and counsel alluded to this. This project has never been completed, and they don't dispute that. It's never been completed because Section 14.07 of the contract requires ONARGA to sign off and acknowledge that the project has been completed, and they've never done that. Now, counsel argued right at the very end of his comments that that's ridiculous to allow that because communities or owners of projects could hold out statute of limitation into perpetuity, but that's not reasonable. A party that refuses to acknowledge that a project has been completed has to do so with some reason. It has to be reasonable. I mean, you can't accept your project and everything's working fine and you don't have any deficiencies and you're not complaining, and you say, well, I'm not going to say it's completed. The courts wouldn't allow that. It would be a fact-driven test as to whether there's really a deficiency that precludes the job from being completed. This is exactly what we have here. This job was never completed, and the defendants, Atlas and Hanover, don't dispute that. They don't dispute that this job has never been accepted, never been completed. In fact, there was a mediation conference in this case less than a year before suit was filed. They continued to discuss the resolution of this dispute. They continued to address problems, and when that was unsuccessful, suit was filed. So from the time shortly after this project began, there were problems. Different new additional problems kept popping up throughout the project. There was an interaction between the parties to try and resolve those issues, and ONARGA and any other owner of a project should not be in a position to have to start filing lawsuits during the project against the contractor that you have to continue to work with throughout completion of the project. And that's what the Single Endeavor Doctrine recognizes. Now, we talk about cases that were pre-1992. Let's talk about some cases post-1992. The McHugh case is a perfect example. Now, it's a Federal District Court case. It's an Article III judge, not a bankruptcy judge. And the Borak case, while it does address this issue and has some language that's helpful to the defendants in this case, it's a 1996 decision by a bankruptcy judge at the trial level that's never been cited by anyone, and it's distinguished in a number of different ways that we've identified in our brief. And then you have the McHugh case, two decisions in 2016 and 2017. This is a modern trend. This is a recent decision by an Article III Federal District judge and adopted the Single Endeavor Doctrine. Now, granted, it did have to do with payments, but for the reasons I stated at the beginning of my comments, there shouldn't be a distinction between payments and defective construction, because the same principles should apply. If you've got a long project, you don't want to have to make a party start suing someone they have a contract with during the course of the project. Or you don't want to have them – you want the parties to work together to try and resolve these issues, which is what was happening during this project. There were multiple meetings, multiple discussions, identified multiple additional problems after the first problems were identified. The first problem that was identified was a bad gasket fit. That was the first problem. There were multiple additional problems. And what Hanover and Atlas want to argue, based upon a too confined or literal reading of the statute, is, sorry, you know, you didn't sue us fast enough. But isn't that like the LaSalle Bank case? I mean, the crux of that was whether or not they knew or should have known that it was negligent, but it was because of wrongdoing. That there is a recognition that there was something wrong, but because they had continued to work on it, they felt that it was something maybe that was out of anyone's control. And then at the point of time, they're like, no, this is because you don't know what you're doing or you've done something wrong. That's when the four years puts it. Well, let's look at what happened in this case. What happened in this case is problems were identified, which are set forth in our briefs. Multiple problems, a series of consecutive successive problems that were identified. ONARGA, through Soderman and its own representatives, complained of these problems. And one thing that Atlas did says, well, that's not our problem. That's E1's problem or that's Soderman's problem. So everybody was pointing fingers, shifting blame. We were trying to resolve them, even though Atlas was saying that's not our – we didn't do that. They tried to resolve them. E1 tried to resolve them. Soderman tried to resolve them. They were working together, and this is what we want to do. We want to encourage parties to a contract to work together during the project. What we don't want to do is to force them to go out and file a lawsuit while the project is still going on. Atlas was trying to fix these problems. E1 was. Soderman was. They were all trying to fix these problems. And that's why the project continued. And that's why we didn't terminate the project. That's why the issues continued to accumulate until the point where it's clear that the project was never completed and never accepted. Still to this day, this project, this sewer system does not work. And what ONARGA tried to do was what any reasonable customer in this situation would do, is try and resolve it, try and work it out. We're still on the job. We're still working on it. We're still trying to get things to work. And we shouldn't force them to go out and file a lawsuit when people are trying to work on the project. And also the fact that there was knowledge or the facts, the ones I knew or should have reasonably known of the actual mission. That's a given in this case, right? Well, we knew there were problems. There's no question about that. That part from the statutory language is a given in this case. We don't dispute that we knew there were deficiencies and knew there were problems. That's not the issue. But if you look at the case, if you look at the LaSalle case and some of the other decisions, the analysis in McHugh even, it talks about a two-prong test. The first prong is knowing of the injury. We clearly knew of the injury. We knew of the deficiencies. And those were identified through our engineer on the site, Soderman, and from our own conversations with the various parties who were involved. But what the law requires is the second prong, and that is that it was wrongfully caused. And if you look at these cases, again, LaSalle National Bank, that part of the prong wasn't met here because we can't know it's wrongfully caused until they stop trying to fix it. They have a contractual obligation to fix these problems. They had a contract to do this work, to complete this project in a workmanlike manner so we had a usable, workable sewer system. But, I mean, there comes a point in time when somebody says, you know, we're trying to fix it, but they are obviously giving you lip service. At that point, is it reasonable to say that you should know that, you know, now they aren't really trying to resolve an issue? I agree, Justice O'Brien. There is a point. And what we're saying, Judge, is that point hadn't come. That point hadn't come. We're still discovering new defects three and a half years before suit was filed. They're still trying to work on them. They're still trying to get them resolved. They were trying to fix them. And what I'm saying is, because we've already recognized the single endeavor doctrine under the statute, I mean, 214, I believe, when read literally, it applies to issues of payment. We've acknowledged that as a, not an exception, but an interpretation allowing for a suit to be filed after the project has been completed. Everybody acknowledges that. And what I'm saying is, if it applies to payment issues because of the complexities and not wanting to file suit against somebody you're working with and having multiple payment deadlines, it should apply equally to situations of deficient construction. This isn't a situation where the job was completely done, we knew about the deficiencies, we didn't do anything, we sat on our rights and we filed suit five years later. That's not what happened here. This project continued on for years and years and years with deficiency after deficiency after deficiency, and we worked with the contractors to try and resolve those deficiencies. And at some point, you're right, at some point the statute has to start running, but this project has never been completed. And what the defendants want to say is, hey, too bad, so sad, you know, it's been more than four years since you first knew that we screwed up. But the problem was that they were working, they appeared to be working on trying to resolve the deficiencies. And on and on it went until it got to the point where clearly that wasn't happening anymore and suit was filed. There was never a period of time, there was never a gap when we sat back on our rights and didn't do anything. We constantly were working on trying to get the issues resolved. There was never a period of time where we accepted the job, we thought it was working, and didn't do anything. That never happened. This job has still never been accepted or completed, and the defendants don't dispute that. All they say is, well, that's not really fair because you could hold final completion up forever. No, you can't. There has to be a reason for doing it. It has to be reasonable. If a project is working and it's done and it's been completed, you can't unreasonably withhold the completion certificate. But this project clearly did not ever get completed. It's not working. And it's a logical rule that makes sense. The single endeavor makes sense. It applies. And if you look at the rationale of the McHugh decision, granted, it's not binding authority, it's persuasive, it's two years old, it makes perfect sense, and it should apply to construction deficiencies as well as payment issues. If I may close. Briefly. We know the single endeavor doctrine makes sense. We know it's been applied for over 100 years to certain situations, and I believe that it should apply to this situation as well. This sewer project has never been completed. At least we know some of the deficiencies were discovered less than three years before suit was filed. So at least to some of the deficiencies, even if you strictly apply the statute, there are deficiencies that fall within the four years. But I submit that we shouldn't just parse out that one single deficiency, but we shouldn't allow it to apply to all the deficiencies, given the unique facts in this case. The Court should affirm the trial court and apply the single endeavor doctrine to the facts of this case and allow this lawsuit to proceed. Thank you. Thank you. Mr. Wilson. Mr. Geis, before we vote on it. I want to make some points in necessarily no particular order. The first point I want to make, if the General Assembly 30 years ago, when it adopted this statute, had intended final completion to be a trigger for a defective construction claim, it would have written that into the statute. And it didn't. So the clear intent of the legislature 30 years ago, when it enacted this statute of limitations, did not include the very concept that Mr. Wolf wants you to adopt. Once again, ONARGA cannot cite you to a single case that supports their position, that this single endeavor doctrine should be applied to a defective construction claim. There's always a first case. There is always a first case. I understand that, Justice Carter. And, again, with respect to these nonpayment claims, I acknowledge that some construction projects go on for many, many years. That happens throughout this country. Yet the reason why the Illinois courts have applied this single endeavor doctrine is by the end of the project, even if it's a three-year project, by the end of that project, the contractor knows whether it's going to get paid for all the work it did for the prior years, and that's when the statute begins to run. Once again, the cases, particularly Knox College and Freeport Hospital, say that you don't need to know the full extent of the injuries in order to trigger the statute of limitations. And that's what he's trying to say with this one extra problem that they found out about in June of 2014. They didn't know the full extent, but that's not the standard. The standard, again, once again from the various cases, is the time when a reasonable person suspects that a legal duty has been breached. He acknowledges that they were aware of these problems throughout the course of the project. They even notified Atlas's bonding company in June of 2011 that they were claiming that Atlas had defaulted under the terms of the project. At that time, undoubtedly, the statute of limitations began to run when you put the bonding company on notice that we are failing to perform under the terms of the contract. That's the trigger, the time when they knew that a legal duty had been breached. So at the very latest in June of 2011 is when this statute should have been triggered. What about Mr. Wolf's argument that because of having to work together in this project, taking some time, that as a matter of public policy, we should adopt the single endeavor rule so that these people can continue to work together, go in, file a lawsuit pretty soon, nothing's happening. What's your response to that? Well, I think that there's an easy remedy when that occurs. That's called a tolling agreement. The parties can enter into a tolling agreement to toll any running of statute of limitations as they continue to try to work together so that you're not hauling off and running off to the courthouse to do that. There is a remedy for that situation, and ANARDA didn't undertake the opportunity or avail itself of the opportunity to enter into a tolling agreement. And you don't have to haul off and run off to the courthouse under this statute once you are aware of the problems of giving rise to the claim. You've got four years. You've got four years. You don't have to run the next day or the next week or the next month to file a lawsuit. You've got four years under the statute. So his trying to claim that you're going to ruin the cooperative spirit of a construction project by forcing one party or another to run off to the courthouse is simply untrue. The Illinois legislature has given parties four years from when you knew or should have known. We do dispute that this project is finished. Soderman said it was finished in August of 2010. E-1 said the project was finished in 2010. We believe the project was finished in August of 2010. The only reason why they're not saying it's finished is because they haven't signed a piece of paper saying that. And when Soderman and E-1 said this project was finished in August of 2010, he dismissed them from the lawsuit. So once again, Justices, this statute is clear. For an owner's defective construction claim, the four-year statute of limitations runs from the time when the owner knew or should have known of the act or remission giving rise to the claim. Adding any conditions or adding any exceptions to that would be improper, and you would be rewriting the statute of limitations that the General Assembly enacted almost 30 years ago. Thank you. Thank you. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible.